***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence and amend the Opinion and Award, in part. Accordingly, the Full Commission affirms in part, and reverses in part, the Opinion and Award of Deputy Commissioner Glenn.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. An employment relationship existed between the Employee-Plaintiff and the Defendant-Employer, Excel Staffing Services between February 23, 2004 and April 15, 2005.
3. American Zurich contends Excel Staffing was insured for North Carolina employees only after September 25, 2004.
4. This matter involves an injury to the Employee-Plaintiffs' elbows, which was denied by Defendants, as evidenced by the filing of the Form 61 on August 9, 2004.
5. The parties stipulated into evidence the following exhibits: Stipulated Exhibit 1, Employee-Plaintiff's Medical Records; Stipulated Exhibit 2, Industrial Commission Forms; and Stipulated Exhibit 3, Employment Security Commission Records.
6. The following issues are to be decided in this matter:
 a) Whether defendant-carrier admitted the compensability of Plaintiff's claim in a pleading filed with the Commission?
 b) Whether Plaintiff's last injurious exposure to the hazards of his alleged occupational disease occurred during his employment with Excel Staffing? *Page 3 
 c) Whether Plaintiff sustained any injury by occupational disease arising out of and in the course of his employment with Excel Staffing?
 d) What, if any, further benefits plaintiff is entitled to under the North Carolina Workers' Compensation Act?
 e) What is Plaintiff's average weekly wage?
 f) Whether the whole cost of the proceedings, including reasonable attorney fees for Plaintiff's attorney, shall be assessed against the Defendants?
7. The following exhibits were admitted into evidence in this matter:
 a) Plaintiff's exhibit #1, the accident report;
 b) Plaintiff's exhibit #2, plaintiff's pay stubs from defendant-employer;
 c) Defendant's #1, Montemayor records;
 d) Defendant's #2, plaintiff's responses to defendant's Interrogatories;
 e) Defendant's #4, 7/25/03 through 7/25/04 declaration sheets;
 f) Defendant's #5, 7/25/04 through 7/25/05 declaration sheets;
 g) Defendant's #6, notification of change of coverage as of 9/25/04;
 h) Defendant's #7, plaintiff's supplemental responses.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearings before the Deputy Commissioner, Plaintiff was forty-three years old. Plaintiff is right hand dominant. *Page 4 
2. On February 23, 2004, Plaintiff began working at the Veterans Administration Hospital in Salisbury, North Carolina on behalf of Excel Staffing. The VA Hospital and Excel Staffing contracted to supply the labor regarding the remodeling of buildings located at the VA Hospital.
3. Plaintiff was employed by Excel Staffing as a drywall hanger/finisher from February 23, 2004 to April 15, 2005. Plaintiff was the only individual who worked in this position from February 23, 2004 to April 15, 2005.
4. Plaintiff's job duties included providing estimates of how much sheet rock was needed; unloading the sheetrock from the truck to its destination in the building; mudding and taping it; and finishing or sanding it to the point it was prepared for painting. Each piece of sheetrock was 4 x 8 feet and 5/8 inches thick; they each weighed 50 to 60 pounds; and he went through the process of unloading to finishing approximately 40 to 50 pieces a day.
5. When moving the sheetrock, Plaintiff would carry it cupped in his fingers in his right hand, with all of the weight bearing on his right extremity, and he would balance it with his left arm and his head. He would carry the sheetrock on average a 100 to 120 feet from the truck to its destination in the building.
6. When hanging the sheetrock, Plaintiff would exert approximately 20 to 25 pounds of pressure in order to put it into place. Then, as required by Building Codes, he would place 48 screws per sheet into the sheetrock. He would apply the screws using a drywall gun. Plaintiff usually used his right hand to apply the screws with the drywall gun, however, sometimes he would use his left hand, depending on what arm he was using to hold the sheetrock in place as he applied the screws. *Page 5 
7. He then applied the first coat of mud and placed sheetrock tape on top of the mud. He would scrape off the mud and leave the tape exposed. He would repeat this step and then apply a third coat of mud to finish the sheetrock. The mud bucket weighed between 45 and 55 pounds, which he would hold in his left hand and would dip the trough with his right hand into the bucket.
8. Finally, Plaintiff would sand the sheetrock with a manual pole sander. He testified that the VA Hospital disallowed electric sanders due to the potential for dust affecting its patients. The pole sander was 4 feet long and had a sand paper pad on the end of it. He would have to put pressure on the pole in order to adequately sand.
9. At the inception of the project, 1200 to 1600 pieces of sheetrock were ordered and at the end of the project, 51 pieces remained. Plaintiff testified that he personally hung over 1400 pieces of sheetrock between February 23, 2004 and April 15, 2005.
10. After beginning the job of drywaller/finisher, Plaintiff began to develop problems in his right elbow. His right arm would sting and burn and he had a difficult time picking up anything of any weight. Due to the pain in his right arm, he began to overcompensate with his left arm and used his left arm to perform the duties described above that he had performed with his right.
11. It got to the point where the pain bothered him enough that he reported his injuries to his supervisor, Dave Harless. Mr. Harless informed Plaintiff that he should contact Billie Brown, CEO and President of Excel. Plaintiff called Ms. Brown and explained his bilateral arm symptoms to her on March 7, 2004.
12. Plaintiff presented to his primary care physician, Dr. Ronnie Barrier, on March 9, 2004 with complaints of right elbow pain for a couple of weeks, localized to his right elbow area. *Page 6 
13. Plaintiff continued to work for Excel Staffing in the position of drywaller/finisher, however, he continued to have pain in his bilateral arms. On May 7, 2004, June 7, 2004 and July 14, 2004, Plaintiff presented to Dr. Barrier each time with "terrible" problems with his right arm/elbow.
14. In July 2004, Ms. Brown visited the project at the VA Hospital and Plaintiff explained his problems again to her. Ms. Brown recommended that he present to his primary care physician for evaluation.
15. In July 2004, Plaintiff completed an accident report. The date listed as the date of injury on the accident report was March 9, 2004. Plaintiff listed Ms. Billie Brown and Mr. Dave Harless as the individuals he reported his injury to. He listed the nature of the injury as "lifting sheetrock by myself."
16. Plaintiff returned to Dr. Barrier on July 29, 2004, indicating that as a result of his right arm/elbow pain, he was at the point where he was unable to work effectively or efficiently. As such, Dr. Barrier wrote Plaintiff out of work from August 2, 2004 to August 15, 2004.
17. On August 9, 2004, defendant-carrier filed a Form 61, denying workers' compensation coverage on behalf of Excel in the state of North Carolina.
18. On August 10, 2004, Dr. Barrier referred Plaintiff to Dr. Jeffrey Baker, an orthopedic surgeon.
19. After August 15, 2004, Plaintiff returned to work at Excel and performed the same duties that he was performing prior to Dr. Barrier taking him out of work on August 2, 2004. *Page 7 
20. Plaintiff presented to Dr. Baker on September 13, 2004. Dr. Baker noted that he presented with right elbow pain that began in March 2004. Dr. Baker recommended and administered an injection of lidocaine and kenalog into his right lateral epicondyle.
21. A Form 33 was filed on November 17, 2004 by Plaintiff. The date of injury listed on the Form 33 was March 9, 2004, the date which Plaintiff listed on the accident report he completed. At this time, Plaintiff sought payment of medical expenses/treatment and payment for permanent partial disability.
22. Plaintiff continued to work for Excel as a drywaller/finisher until the completion of the V.A. Hospital project on April 15, 2005.
23. During his employment with Excel, Plaintiff was approached by a representative of Montemayor, Inc., an entity that also provided contract services at the V.A. Hospital. Plaintiff was observed performing his duties for Excel by a Montemayor representative. The representative asked if he would be willing to work some evenings training Montemayor employees on how to hang sheetrock. Plaintiff completed a Montemayor job application on November 30, 2004. Plaintiff listed Excel as his current employer on the November 30, 2004 job application for Montemayor. Plaintiff's job duties with Montemayor were purely supervisory and performed only on an as-needed basis. Plaintiff did not perform any physical labor while working for Montemayor. From November 30, 2004 until September 16, 2005, Plaintiff worked a total of 99 hours for Montemayor. After April 15, 2005 to September 16, 2005, his last day of work with Montemayor, Plaintiff worked a total of 48.5 hours for Montemayor.
24. After Plaintiff's last day of work with Excel on April 15, 2005, he was approached by the V.A. Hospital to perform miscellaneous light duty work. The V.A. had an inspection approaching and Plaintiff was hired to perform strictly "cosmetic" work in order to *Page 8 
make the V.A. "look good" for the inspection. His employment with the V.A. was from April 29, 2005 to June 29, 2005.
25. Plaintiff testified that neither the work he performed for Montemayor or the V.A. Hospital made his bilateral arm symptoms any worse than when he was working for Excel because the work for Montemayor and the V.A. Hospital was all non-physical work.
26. On September 20, 2005, Plaintiff presented to Dr. Michael Lauffenburger, an orthopedic surgeon, with complaints of severe right elbow and left elbow tendonitis for the last six months. Plaintiff also described the job duties he performed while working for Excel to Dr. Lauffenburger.
27. Dr. Lauffenburger recommended and performed right elbow arthroscopic surgery with extensive debridement on September 22, 2005. On November 10, 2005, Dr. Lauffenburger performed arthroscopic surgery with extensive debridement to Plaintiff's left elbow.
28. Plaintiff filed an Amended Form 33, seeking compensation for temporary total disability benefits as a result of the problems with his elbows, in addition to medical and permanent partial disability benefits, and it was filed on or about December 15, 2005.
29. Plaintiff's right arm improved post-operatively, however, he continued to have an immense amount of pain in his left arm.
30. On February 7, 2006, Plaintiff presented to Dr. Lauffenburger very anxious to go back to work. On February 7, 2006, Dr. Lauffenburger assigned light duty restrictions to plaintiff's arms of no lifting more than 10 pounds; lifting with his palm up and no palm down; avoidance of any repetitive use of the arm; and no vibratory type of tool use or heavy squeezing or gripping. *Page 9 
31. Prior to his injuries, Plaintiff had never performed any type of work that was within the restrictions Dr. Lauffenburger assigned on February 7, 2006.
32. Plaintiff is a high school graduate and has a carpentry degree from Midland's Community College. He has been a carpenter his entire working career.
33. After being released by Dr. Lauffenburger on February 7, 2006, Plaintiff began looking for work within his restrictions at McDonalds, Burger King and Dollar General and many construction sites to no avail.
34. On March 21, 2006, Plaintiff returned to Dr. Lauffenburger with continued pain in his left elbow. Dr. Lauffenburger recommended and performed revision surgery to the left elbow on April 24, 2006. Dr. Lauffenburger found that the first surgery to the left arm had failed to heal and there was still an area of the tendon that was unhealthy and needed to be removed.
35. Dr. Lauffenburger wrote Plaintiff completely out of work as of April 24, 2006, the date of the left elbow surgery.
36. During the time he was written out of work, Plaintiff began to aggressively look for employment. He received an offer from a company named DIS, as a painter.
37. On August 22, 2006, Dr. Lauffenburger noted that he had been offered a job as a painter and that he wanted to take it, and he released Plaintiff with restrictions of no lifting over 5 pounds and no repetitive work with his left arm. Plaintiff communicated his restrictions to DIS and was informed that they could not hire him with those limited restrictions.
38. The April 24, 2006 surgery did improve plaintiff's left elbow problems, however, Plaintiff testified that he developed pain in his left wrist. The pain in the left wrist was diagnosed as DeQuervain's disease, an inflammation of a tendon sheath at the level of the wrist. *Page 10 
39. Dr. Lauffenburger recommended and performed surgery on plaintiff's left wrist on October 17, 2006.
40. Dr. Lauffenburger did not give any restrictions to plaintiff's right arm; but, as to his left arm, he restricted plaintiff to no lifting more than 15 pounds and no repetitive use.
41. Plaintiff began working at Dollar General part-time on February 19, 2007. He is employed as a cashier and earns $6.15 per hour. Per company policy regarding part-time employees, he is not able to work more than 23 hours a week.
42. Plaintiff was unemployed from September 20, 2005 until February 19, 2007, despite applying and inquiring about a wide variety of jobs during that time period.
43. Plaintiff applied for and received unemployment benefits in the amount of $8,788 from July 3, 2005 to December 26, 2005.
44. Billie Brown, President and CEO of Excel Staffing, testified at the hearings before the Deputy Commissioner. Ms. Brown incorporated Excel Staffing in 1999. Its principal place of business is located in Richmond, Virginia. Excel Staffing is a temporary staffing agency with two divisions: clerical/administrative and light industrial.
45. Ms. Brown's testimony regarding the hiring, job duties and communications exchanged concerning Plaintiff's bilateral arms, corroborated Plaintiff's testimony. She testified that Mr. Brodie was "a very good worker."
46. At the time Excel won the contract from the United States government to work on the Veteran's Administration Hospital, Ms. Brown realized the need for workers' compensation coverage for soon-to-be North Carolina employees. Ms. Brown notified her producer, AISS, for coverage. However, AISS failed to pass this request on to Zurich or Zurich's administrator, Travelers. The record shows that, although Excel had coverage through Zurich for its Virginia *Page 11 
employees, Excel never obtained a policy from Zurich providing coverage in North Carolina until September 24, 2005. The Full Commission finds that plaintiff's lateral epicondylitis was contracted prior to the date that Zurich was on the risk in North Carolina and, thus, Zurich is not liable.
47. Dr. Lauffenburger was of the opinion to a reasonable degree of medical certainty that Plaintiff's work at Excel Staffing from February 23, 2004 to April 15, 2005 placed him at an increased risk for the development of bilateral epicondylitis in his arms.
48. Further, Dr. Lauffenburger was of the opinion to a reasonable degree of medical certainty that the job activities at Excel were a significant contributing factor to Plaintiff's development of bilateral epicondylitis.
49. Dr. Lauffenburger also believed that the jobs performed by plaintiff after April 15, 2005 would certainly not augment bilateral epicondylitis if they were supervisory and light in nature. The greater weight of the evidence establishes that Plaintiff was last injuriously exposed to the hazards of his occupational diseases during his employment with Excel Staffing.
50. Dr. Lauffenburger was of the opinion that Plaintiff's job duties at Excel were a contributing factor in the development of his DeQuervain's tenosynovitis; however, the Full Commission finds Dr. Lauffenburger's testimony to be speculative and insufficient on the issue of causation. Dr. Lauffenburger was merely of the opinion that plaintiff's employment "could" have caused DeQuervain's disease, or might have been a "potential" cause. Moreover, when questioned during deposition regarding the sixteen month gap between plaintiff's employment with Excel and plaintiff's development of DeQuervain's symptoms, Dr. Lauffenburger admitted that he had never seen a case of DeQuervain's tenosynovitis develop in a patient more than a year after stopping the activity that ultimately caused the development of the disease. Thus, the *Page 12 
Full Commission finds there to be insufficient evidence upon which to find that plaintiff's DeQuervain's tenosynovitis is causally related to his employment with Excel.
51. Plaintiff has been unable to work as a carpenter by reason of his compensable occupational disease and his surgical procedures since September 20, 2005. The permanent restrictions assigned by Dr. Lauffenburger after his last surgical procedure on October 17, 2006, show he is no longer capable of working as a carpenter. Defendant-employer has not offered plaintiff any work within his limitations.
52. Plaintiff was temporarily partially disabled from April 15, 2005 to September 19, 2005 and totally disabled from September 20, 2005 to February 19, 2007.
53. Plaintiff would benefit from vocational rehabilitation and should be provided with this opportunity.
54. A Form 22 was not filed in this matter. Based upon a careful review of the record in this matter, the Full Commission finds that plaintiff's wages during the fifty-two weeks immediately proceeding the date of plaintiff's disability to be a fair and just estimation of plaintiff's average weekly wage. The Full Commission finds that plaintiff's average weekly wage for the fifty-two weeks immediately proceeding plaintiff's disability is $678.86, which yields a compensation rate of $452.80.
55. The Full Commission finds that defendants have not defended this matter without reasonable ground.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW *Page 13 
1. Plaintiff developed bilateral epicondylitis and medical complications due to causes and conditions characteristic of and peculiar to his employment with defendant-employer. This bilateral epicondylitis and further medical complications is not an ordinary diseases of life to which the general public not so employed is equally exposed and is, therefore, an occupational disease. N.C. Gen. Stat. § 97-53(13).
2. Based upon a careful review of the record in this matter, the Full Commission concludes that plaintiff's wages during the fifty-two weeks immediately proceeding the date of plaintiff's disability to be a fair and just estimation of plaintiff's average weekly wage. The Full Commission concludes that plaintiff's average weekly wage for the fifty-two weeks immediately proceeding plaintiff's disability is $678.86, which yields a compensation rate of $452.80. N.C. Gen. Stat. § 97-2(5).
3. Plaintiff, as a result of his development of bilateral epicondylitis, a compensable occupational disease, is entitled to temporary partial disability benefits equal to the difference between plaintiff's average weekly wage prior to his disability ($678.86) and the average weekly rate he was able to earn thereafter from April 15, 2005, to September 19, 2005, and from February 19, 2007 and continuing until further order of the Commission for a total period not to exceed 300 weeks. N.C. Gen. Stat. § 97-30. 4. Plaintiff, as a result of his development of bilateral epicondylitis, a compensable occupational disease, is entitled to temporary total disability benefits from September 20, 2005 to February 19, 2007 at a rate of $452.80. N.C. Gen. Stat. § 97-29. However, plaintiff is also entitled to permanent partial disability compensation benefits pursuant to N.C. Gen. Stat. § 97-31. Thus, plaintiff shall elect the greater remedy.
5. Plaintiff is entitled to all medical treatment that would effect a cure, give relief, or *Page 14 
lessen plaintiff's period of disability as a result of his bilateral epicondylitis. Defendants are to pay for all such care, both past and future. N.C. Gen. Stat. §§ 97-2-(19) and 97-25.
6. Plaintiff is entitled to reasonable vocational rehabilitation, which should be provided by defendants. N.C. Gen. Stat. § 97-25.
7. Defendants are entitled to a credit for the unemployment benefits received by plaintiff during any period in which plaintiff received indemnity compensation. N.C. Gen. Stat. § 97-42.1.
8. The Full Commission concludes that defendants have not defended this matter without reasonable ground. Thus, the Full Commission, in its discretion, declines plaintiff's request for attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant Excel shall pay to plaintiff temporary partial disability benefits equal to the difference between plaintiff's average weekly wage prior to his disability ($678.86) and the average weekly rate he was able to earn thereafter from April 15, 2005, to September 19, 2005, and from February 19, 2007 and continuing until further order of the Commission for a total period not to exceed 300 weeks. This award is subject to the attorney's fee provided herein. Compensation that has accrued shall be paid to plaintiff in a lump sum.
2. Plaintiff is entitled to temporary total disability benefits from September 20, 2005 to February 19, 2007 at a rate of $452.80; however, plaintiff is also entitled to permanent partial disability compensation benefits pursuant to N.C. Gen. Stat. § 97-31 and, thus, must make an *Page 15 
election of his greater remedy. Defendant Excel shall make prompt payment of compensation upon plaintiff's election of his greater remedy, and such compensation shall be subject to the attorney's fee provided herein.
3. Defendant Excel shall provide to plaintiff all medical treatment that would effect a cure, give relief, or lessen plaintiff's period of disability as a result of his bilateral epicondylitis. Defendant Excel shall pay for all such care, both past and future.
4. Defendant Excel shall provide to plaintiff reasonable vocational rehabilitation.
5. Defendant Excel shall pay directly to plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five percent (25%) of all indemnity compensation awarded herein. Fees based upon compensation that has accrued shall be paid to plaintiff's counsel in a lump sum; thereafter, plaintiff's counsel shall receive every fourth check of compensation due to plaintiff.
6. Defendant Excel is entitled to a credit for the unemployment benefits received by plaintiff during any period in which plaintiff received indemnity compensation.
7. Defendant Excel shall pay the costs of this matter.
This ___ day of October 2008.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
S/___________________ BUCK LATTIMORE *Page 16 
COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1